UNITED STATES of America ex rel. James Morris JOHNSON

v.

Alfred T. RUNDLE, Superintendent, State Correctional Institution at Philadelphia, Pennsylvania.

Misc. No. 2683.

United States District Court
E. D. Pennsylvania.

Sept. 30, 1964.

H. Lester Haws, Ardmore, Pa., and Daniel L. Quinlan, Jr., Norristown, Pa., for petitioner.

Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., for respondent.

HIGGINBOTHAM, District Judge.

This is a petition for habeas corpus instituted by relator, James Morris Johnson, a Pennsylvania state prisoner serving a sentence of life imprisonment for murder. State remedies have been exhausted and the case is properly before this Court for decision on the merits of the constitutional question presented herein.[1]

The issue centers around the controversial "Parker Rule," which was the law of Pennsylvania at the time of relator's trial. See Commonwealth v. Parker, 294 Pa. 144, 143 A. 904 (1928), interpreting the Act of May 14, 1925, P.L. 759. Under the procedure in first degree murder cases sanctioned by the Parker decision, proof of a defendant's prior unrelated convictions could be submitted to the jury during the prosecution's case in chief at the same time as evidence on the question of guilt—this for the purpose of assisting the jurors in determining whether a sentence of life imprisonment or of death should be imposed if they found the defendant guilty. Under this procedure the jury was required to decide which should be the penalty at the same time that they returned a verdict of guilty. This procedure was later modified by the "Split Verdict Act" of December 1, 1959, P.L. 1621, § 1, 18 P.S. § 4701 (Supp.) under which evidence of prior unrelated convictions introduced for the purpose of ascertaining sentence can only be admitted in a supplementary hearing after the jury has found the defendant guilty. This statute, however, was enacted after relator's trial and does not apply to him.

The Third Circuit has decided two cases involving the constitutionality of the Parker Rule. In United States ex rel. Scoleri v. Banmiller, 3 Cir., 310 F.2d 720 (1962) the Court en banc held that the introduction of the defendant's prior record into evidence under the facts of that case was "so prejudicial * * * as to constitute a denial of due process of law to Scoleri." (310 F.2d at 736). And in United States ex rel. Rucker v. Myers, 311 F.2d 311 (3rd Cir. 1962), decided shortly after Scoleri, a three-judge panel held under the facts and circumstances of that case, that the introduction into evidence of defendant's prior record under the Parker Rule did not prejudice the defendant Rucker since the evidence of guilt was so overwhelming and the defense so weak that there was "no basis for apprehension that the jury

---

1. Relator was originally sentenced to death at his first trial in May 1948, but on appeal to the Pennsylvania Supreme Court that conviction was reversed and a new trial was ordered. 368 Pa. 139, 81 A.2d 569 (1951). Relator was convicted at the second trial and this time sentenced to life imprisonment. This conviction was affirmed by the Pennsylvania Supreme Court (372 Pa. 266, 93 A.2d 691 (1953)), and certiorari was denied by the United States Supreme Court, 345 U.S. 959, 73 S.Ct. 944, 97 L.Ed. 1379 (1953). A petition for habeas corpus was then filed in the Common Pleas Court which granted the writ. 81 Montg.Co.L.R. 37 (1962). The Commonwealth appealed to the Pennsylvania Supreme Court which reversed the lower court. 411 Pa. 497, 192 A.2d 381 (1963) (Cohen, J., dissenting.). After certiorari was denied by the United States Supreme Court (376 U.S. 918, 84 S.Ct. 673, 11 L.Ed.2d 613 (1964)), this petition was filed. The constitutional infirmity on which relator relies was duly raised and considered by the Pennsylvania Courts and accordingly the Commonwealth does not contest this point. See Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

determination of guilt may have been unfairly influenced by the evidence of prior crimes." (311 F.2d at 315.) I read these two decisions as adopting a factual case-by-case approach to determine whether the introduction of a defendant's prior record under the Parker Rule may be prejudicial. Only where there is no realistic probability of serious prejudice, as in Rucker, should a conviction based upon the Parker Rule be permitted to stand. In the instant case not only was there a realistic probability of prejudice, but I fear that the unusual nature of defendant's prior record may have removed all doubt from the jurors' minds on the question of guilt.

On May 9, 1948, at 8:55 P.M., an eastbound train of the Reading Railroad was derailed near the station at Valley Forge, Pennsylvania, resulting in the death of the engineer and the fireman of the train. An investigation disclosed that a section of the track had been tampered with and a number of spikes and the plates had been removed from the rail on which the train was travelling. The rear window of a tool house on the Reading Company property had been broken into and a claw bar for pulling railroad spikes and a wrench were missing.

For six months the investigation produced no suspects. Finally suspicion was directed to the relator as a result of his prior conviction in the State of Delaware for the crime of "Obstructing a Railroad." On November 7th, Pennsylvania Police authorities went to a small town in South Carolina and found that relator had been picked up for a minor traffic violation by the South Carolina authorities and was being held in jail on a charge of illegal entry. Johnson was told that he was wanted for parole violation and was asked if he was willing to return to Pennsylvania. Johnson, a Negro, returned from South Carolina to Pennsylvania willingly without extradi-

tion, "according to his testimony at the trial, because he felt that he would rather come back and face the charge of parole violation in Pennsylvania than take a chance on being sentenced perhaps to a chain gang in Carolina * * * " [2]

From November 7th until November 13th, the date he was arraigned, Johnson, who had a 7th grade education, was held in custody without counsel and questioned several times by the Pennsylvania authorities. During this time relator signed two statements confessing to stealing the claw bar and wrench and using them to pull up the spikes. Johnson was also taken to the toolhouse and the scene of the derailment where he reenacted how the tools were taken and the spikes were pulled. Prior to the hearing on November 13th, and his statements and reenactment, Johnson was never informed by the authorities that a passenger train had been wrecked and that two persons had been killed.[3]

At the trial, the Commonwealth offered no direct evidence of defendant's guilt. The 10 pound wrench and the 30 pound claw bar were never found. No fingerprints or any other type of identification evidence linking Johnson to the crime was introduced by the Commonwealth. The sole evidence connecting relator with the crime was the confessions and testimony surrounding the reenactment. On this point the trial judge charged the jury that "[i]f you disregard the alleged oral and written statements attributed to the defendant as having been unlawfully obtained in violation of the defendant's constitutional rights, there is no evidence whatever to connect the defendant with the crime charged, and therefore your verdict must be not guilty." [4]

Defendant's evidence consisted of testimony that he was induced to sign the statements because he was led to under-

---

2. Opinion of Judge Corson Sur Johnson's Motions for New Trial and Arrest of Judgment at October 1951 trial, Record, 1124a.

3. Record, 348a–350a, Trial of October 1951.

4. Record, 1070a, Trial of October 1951.

stand that by admitting to removing a few spikes and stealing tools—all without knowledge of the wreck and resulting deaths of two people—he would get less time in prison in Pennsylvania than he would for the unlawful entry charge in South Carolina. The defendant also testified that the information contained in the written statements and in the re-enactment was suggested to him by the authorities. This testimony was disputed by the prosecution. In addition, a number of witnesses testified that defendant was in or near Pocomoke City, Maryland—170 miles away from the wreck—around the time in question. This testimony too was disputed by the Commonwealth.

Near the end of the prosecution's case, the Commonwealth introduced the defendant's prior record into evidence under the Parker Rule. The record consisted of a burglary conviction in 1937, a Delaware conviction for obstructing a railroad in 1940, and a 1948 conviction of burglary. Over the objections by defendant's counsel on due process grounds, this evidence was introduced for the ostensible purpose of assisting the jury in determining whether a sentence of life imprisonment or death should be imposed in the event that they found the defendant guilty. This was introduced even though the Assistant District Attorney did not at any stage of the trial press for the death penalty and even though the juror who was accepted as foreman of the jury had stated during the voir dire examination that he would not return the penalty of death. This juror was not challenged by the prosecution. On cross-examination of witnesses for the Commonwealth who testified about defendant's prior record, it was disclosed that the 1937 burglary conviction involved theft of railroad property and that the facts of the 1940 conviction showed a striking similarity to the methods used in the present case.[5]

These circumstances are not related to retry a case which has been before the Pennsylvania Supreme Court nor to re-evaluate the weight and credibility of the evidence which the jury resolved against the relator on the issues of alibi and voluntariness of the statements and re-enactment. These circumstances, however, are relevant and essential in determining—under Scoleri and Rucker—whether the introduction of defendant's prior record of unrelated offenses had an adverse effect upon the verdict of the jury.

In the Rucker case the defendant made a full confession a few hours after his arrest. There was no contention that the confession was coerced or induced by trickery. In addition, the defendant Rucker was arrested a short distance from the scene of the murder with blood stains on his arms and clothing and with the fruits of the crime (robbery) in his possession. Most telling was the absence of any kind of real defense (defendant's defense was habitual drunkenness) in that case. As Judge Hastie stated in Rucker: "There was neither a significant conflict in the evidence nor a doubtful issue of fact in connection with which the jury's awareness of the defendant's prior conviction * * * could have been prejudicial. Indeed, a reading of the record makes it very clear that the only real question was whether death or a lesser penalty should be imposed as punishment for the felony-murder." (311 F.2d at 314.)

Here, the contrary is true. There were significant conflicts of evidence on the two major issues which would have exculpated the defendant (alibi and "involuntary" confession). Indeed, the jury could have easily found, under the charge of the trial judge, that the six-day period during which the defendant was held prior to arraignment invalidated the statements obtained in this period. Furthermore, Johnson was not found short-

---

5. The Commonwealth does not argue waiver in the instant case, and in my view there was no waiver since defense counsel made timely and vigorous objection on due process and other grounds as to the introduction of these convictions. (Record, 444a, Trial of October 1951.)

ly afterwards near the scene of the crime, as in Rucker, with the fruits of the crime in his possession. And finally, unlike Rucker where " \* \* \* the only real question was whether death or a lesser penalty should be imposed,"[6] here the crucial question was that of guilt or innocence. Both former Chief Justice Jones and Mr. Justic Cohen of the Pennsylvania Supreme Court were shocked by the unfairness of the Johnson conviction. Mr. Justice Cohen dissenting in 411 Pa. 497, 192 A.2d 381 (1963) stated:

> An examination of the entire record discloses that the prosecution had a very flimsy case against the defendant. As former Chief Justice Charles Alvin Jones so aptly stated in his concurring opinion to the first Johnson case, '[t]he books will be searched in vain for a more startling example of a synthetically constructed case of murder against a suspect.' \* \* \* I agree. It is abundantly clear that the prosecution would never have secured a conviction without the introduction in evidence of defendant's prior convictions.

This is not a case which falls somewhere between Scoleri and Rucker. The facts of the instant case cry even louder for a new trial than those which impelled the Court of Appeals to grant a new trial in Scoleri. In Scoleri, the prosecution produced an identification witness who pointed out Scoleri. No direct or indirect evidence of identification was presented here. Even more essential is the precise nature of Johnson's prior conviction and its probable effect upon the jury. The intentional wrecking of a train occurs very rarely. In its opinion denying a new trial, the trial court stated that there were perhaps only three known train wreckers in the United States.[7] It is not unlikely that the jurors took the charge involving the similar factual circumstances of pulling

spikes from a railroad as more than mere coincidence on the question of Johnson's guilt—even though the prior conviction was, of course, *not* legally relevant to that issue. In speaking of the ability of jurors to put the knowledge of a defendant's prior unrelated convictions out of mind in considering his guilt or innocence, Chief Judge Biggs in Scoleri said:

> Certainly such a feat of psychological wizardry verges on the impossible even for berobed judges. It is not reasonable to suppose that it could have been accomplished by twelve laymen brought together as a jury. (310 F.2d at 725.)

I fear that knowledge of this prior conviction for obstruction of a railroad had, at a minimum, a significant effect upon the jury in weighing the legitimate evidence on the question of guilt or innocence.

As the Supreme Court has said through Mr. Justice Jackson, when noting the necessity for certain exclusionary rules of evidence, such evidence could

> \* \* \* weigh too much with the jury and to so *over-persuade them* as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice. Michaelson v. United States, 335 U.S. 469, 476, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948). (Emphasis added.)

While the trial judge was scrupulously fair in his instructions as to the legal relevance of the prior convictions, I must nevertheless conclude that, as Judge Learned Hand has observed, such in-

---

6. 311 F.2d at 314.

7. Record, 1123a, Trial of October 1951, before Judge Corson.

structions are a " * * * recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." See Nash v. United States, 54 F.2d 1006, 1007 (2nd Cir. 1932), cert. denied 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed. 945 (1932).

At oral argument counsel for the Commonwealth sought the distinguish Scoleri on the ground that Scoleri had received the death penalty whereas Johnson was sentenced to life imprisonment. I cannot accept this distinction. The grave unfairness of Johnson's trial is in no way lessened by the fact that he "only" received a life sentence. And though I am well aware of the distinction once made between capital and non-capital cases in Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), the current trend of United States Supreme Court decisions leads me to conclude that the determination of an alleged infringement of a constitutional right would not be contingent upon whether the jury had given the death penalty or life imprisonment.[8]

I therefore grant the petition for habeas corpus since the introduction of Johnson's prior criminal record for obstructing a railroad was so fundamentally unfair as to deny him due process of law.[9]

█ Of course the granting of this writ does not mean that Johnson will automatically go free. The Commonwealth has the right to arraign him again on the indictments in issue after providing him with counsel.[10]

The annals of Pennsylvania criminal cases have few files which equal the conscientious and diligent efforts given by the instant court appointed counsel, H. Lester Haws, in behalf of a pauper. The Court must take official notice of the extraordinary efforts of Attorney H. Lester Haws and his associates for more than 15 years. These efforts included the expenditure of hundreds of hours and counsel's personal funds in the investigation, defense and appeals in this case.[11]

8. Cf. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

9. It should also be noted that the present trial record is not devoid of other serious questions of constitutional import. See Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Jackson v. Denno, 84 S.Ct. 1774 (1964). However, these issues need not be decided in view of my holding above.

10. See United States ex rel. Craig v. Myers, 329 F.2d 856, 860 (3rd Cir. 1964) where the Court of Appeals noted: "Whether the state could prove the 1931 charge in a 1964 trial we do not know. Whether the competent officers of the state would be so Draconian in their administration of justice as to make the attempt, we do not know. In any event, the 1931 indictment has not

been invalidated. The granting of the federal writ of habeas corpus in the present circumstances does not preclude a new arraignment and trial, or the taking of proper steps to hold the defendant in custody or under bail pending trial."

11. It should be noted that Judge David E. Groshens of the Montgomery County Common Pleas Court appeared before the Pennsylvania Pardons Board requesting that a pardon be granted Johnson, and that with the approval of the present Montgomery County Common Pleas Court Judges, former Judge Daniel L. Quinlan, Jr., who granted the writ of habeas corpus at the state trial court level (see footnote 1), appeared before this Court as co-counsel in behalf of relator.